DeALMEIDA, P.J.T.C.
The question before the court is whether plaintiffs approximately twelve-acre, mostly vacant plot of land, on which is located a 290-foot, income-generating, cellular communications tower, qualifies for farmland assessment pursuant to the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1, et seq. The property is put to dual uses. In addition to collecting rent from the operation of the cellular tower, which occupies less than an acre, but stretches approximately 25 stories into the sky, the property owner pays an out-of-state beekeeper to maintain beehives on the property for the production of honey, wax and other products. The bees forage on plants scattered throughout the lot. The beekeeper purchases from the property owner all the apiary products the bees make on the property for amounts just above the statutory minimum for farmland qualification. The small amount collected for the bees’ products consistently results in a financial loss to the taxpayer. After a careful consideration of these facts, the court concludes that the predominant use of the *153 property is the generation of income from operation of the cellular tower. Because the apiary activities are subordinate to the taxpayer’s non-agricultural exploitation of the property, the tax assessor correctly denied plaintiffs applications to assess the property as farmland during the tax years in question.
I. Findings of Fact
This opinion sets forth the court’s findings of fact and conclusions of law on the parties’ motions for summary judgment. R. 1:6—2(f). The court’s findings of fact are based on the certifications and exhibits submitted by the parties on the motions. R. 1:6—2(d).
Plaintiff Atlantic Coast LEH, LLC (“Atlantic Coast”) is the owner of real property in defendant Little Egg Harbor Township. The property is designated by the township as Block 63, Lot 6 and is located on Poorman’s Parkway in the vicinity of the Garden State Parkway. Despite its proximity to the highway, the property is remote. The parcel is a predominantly vacant, triangular plot of 12.24 acres.
In January 2000, Atlantic Coast Communications, Inc. (“AC Communications”), an entity related to plaintiff, was a contract lessee of the property, which was then owned by Harbor Group, a New Jersey partnership. On January 12, 2000, AC Communications secured a use variance from the Little Egg Harbor Township Zoning Board of Adjustment to permit the construction of a 290-foot tower on the property to facilitate wireless communications for cellular telephones. At the time of the application, AC Communications was licensed by the Federal Communications Commission to operate and own seventeen cellular communications towers in New Jersey and elsewhere. AC Communications intended to license space on the tower to various carriers, including Bell Atlantic Mobile, Sprint, Omnipoint, and Nextel.
The intended use required multiple variances, including a use variance, a variance for the height of the tower, proposed at twice the height permitted by the zoning ordinance, a variance with respect to the size of a side yard setback, a variance related to the size of the accessory use structures, and a variance with respect to *154 the distance between the cellular tower and a nearby residence. All of the variances were granted by municipal zoning officials. Commercial beekeeping at the property was not mentioned as an intended use during the variance process.
On December 27, 2000, after issuance of the variances, Michael W. Schmidt, Managing Member of Atlantic Coast and President of AC Communications, purchased the property from Harbor Group for $230,000. On July 16, 2002, Mr. Schmidt sold the property to Atlantic Coast for $100.
Atlantic Coast thereafter leased a portion of the property to AC Communications for construction of the cellular tower. The lessee erected the tower, which is approximately 25 stories in height, near the center of the property, as required by the variances, along with two twenty-feet-by-forty-feet concrete equipment slabs that flank the base of the tower. The tower and pads are enclosed by a chain-link fence in an area encompassing 14,962 square feet, or just over a third of an acre. A gravel driveway covers a portion of the property to provide access to the cellular tower from Poorman’s Parkway. The remainder of the property, nearly twelve acres, is vacant. The cell tower is not staffed by personnel. Occasionally, maintenance workers tend to the tower.
On or about September 15,2008, AC Communications’ stock was acquired by Crown Castle USA, Inc. (“Crown Castle”). At that time, a ground lease was executed between Atlantic Coast and AC Communications for the cellular tower, the ancillary structures, and the 14,962 square feet of land enclosed by the chain-link fence. According to the ground lease, AC Communications, not the property owner, is responsible for 100% of the real estate taxes due on the subject property, including the portion of the property outside of the leased area containing the cellular tower and related structures.
During all of the years in question, Atlantic Coast realized rental income related to the lease of the cellular tower and supporting structures to AC Communications, the details of which are summarized as follows:
*155 _2006 2007 2008 2009
Revenue from rental of cellular tower and accompanying land N/A[1] $6,000 $4,500 $12,000
The record contains no evidence with respect to the income realized by AC Communications through its issuance of licenses to wireless telephone communications companies to use the cellular tower.
In 2003, Atlantic Coast contacted Wilson’s Honey, LLC, an apiary farming entity located in upstate New York, to initiate beekeeping operations at the subject property. After Walter Wilson, the proprietor of Wilson’s Honey, examined the property he authorized his company to construct eight beehives which were placed inside the fenced-in area with the cellular tower. It was necessary to place the beehives within the fenced-in area to provide protection from bears that roam the subject property. In a certification that was not refuted by the township, Mr. Wilson attested to seeing the bees foraging on blueberry bushes, clover, and knapweed throughout the 12.24 acres that comprise the subject property.
Atlantic Coast pays Wilson’s Honey annually for the care and maintenance of the bees on the subject property and for harvesting honey, beeswax and other products. The record contains no evidence with respect to how often employees of Wilson’s Honey travel to the property from New York to tend to the bees and collect bee products. From 2003 to the present Wilson’s Honey purchased from Atlantic Coast all the products generated by bees on the subject property at amounts that barely satisfy the statutory requirements for farmland assessment. There is no indication in the record that Wilson’s paid market rate for the apiary products, how the sales price was negotiated, or whether Atlantic Coast offered the products for sale to any other entity. The financial transactions between Atlantic Coast and Wilson’s Honey are detailed as follows:
*156 _2006 2007 2008 2009
Expense to maintain bees, including payment to bee-keeper_ N/A[2] $1,900 $1,600 $1,550
Income generated by sale of apiary products (all to beekeeper)_ $595 $ 555 $ 550 $ 550
Atlantic Coast’s profitdoss from apiary activity_ Unknown -$1,345 -$1,050 -$1,000
Atlantic Coast applied for farmland assessment for the subject property for each tax year 2006 through 2009. The municipal tax assessor denied each application. The reasons offered for the denial varied.
For tax year 2006, the assessor determined that the area devoted to agricultural or horticultural use was less than 5 acres and that the land had not been devoted to agricultural or horticultural use for two successive years preceding 2006.
For tax year 2007, the assessor determined that gross sales from apiary products did not exceed $500, that the land had not been devoted to agricultural or horticultural use for two successive years preceding 2007 and that the principle use of the property was as a “radio station.” There is no evidence that a radio station ever operated on the subject pi’operty. The same reasons were offered by the assessor when denying the 2008 application. The assessor’s denial for tax year 2009 is not in the record.
For each year 2006 through 2009, Atlantic Coast filed appeals with the Ocean County Board of Taxation challenging the denial of its farmland application for the subject property. The county board upheld the assessor’s determinations for each year through issuance of judgments affirming the assessments on the property. *157 The taxpayer thereafter filed timely Complaints in this court challenging the board’s judgments.
On June 18, 2010, Atlantic Coast moved for summary judgment, requesting that the court enter an Order reversing the county board’s judgments and declaring the property to be subject to farmland assessment for each of the years in question.
On January 26, 2011, the municipality cross-moved for summary judgment, requesting that the court enter an Order dismissing the Complaints.
The court thereafter heard oral argument from counsel.
II. Conclusions of Law
Summary judgment should be granted where “the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.” R. 4:46— 2(c). In Brill v. Guardian Life Ins. Co., 142 N.J. 520, 523, 666 A.2d 146 (1995), our Supreme Court established the standard for summary judgment as follows:
[W]hen deriding a motion for summary judgment under Rule 4:46-2, the determination whether there exists a genuine issue with respect to a material fact challenged requires the motion judge to consider whether the competent evidential materials presented, when viewed in the light most favorable to the non-moving party in consideration of the applicable evidentiary standard, are sufficient to permit a rational factfinder to resolve the alleged disputed issue in favor of the non-moving party.
“The express import of the Brill decision was to ‘encourage trial courts not to refrain from granting summary judgment when the proper circumstances present themselves.’ ” Township of Howell v. Monmouth County Bd. of Taxation, 18 N.J.Tax 149, 153 (Tax 1999)(quoting Brill, supra, 142 N.J. at 541, 666 A.2d 146). The court concludes that this matter is ripe for decision by summary judgment. There are no material facts genuinely in dispute between the parties. Plaintiffs claims can be resolved through application of the law to the undisputed facts.
Pursuant to the Farmland Assessment Act of 1964, N.J.S.A. 54:4-23.1, et seq. (the “Act”) and paragraph 1(b) of Article VIII, *158 Section 1 of the New Jersey Constitution, eligible farmland is assessed at a lower standard than other lands in the State. See New Jersey State League of Municipalities v. Kimmelman, 105 N.J. 422, 437, 522 A.2d 430 (1987). The Constitutional provision permitting preferential treatment of farmland was enacted in the 1963 general election. “Preserving New Jersey’s Forestland Through the Farmland Assessment Act,” 17 Rutgers L.J. 155 (1985). The primary goal of the constitutional amendment and the Act was “to preserve the ‘family farm’ by providing farmers with some measure of economic relief by permitting farmland to be taxed based on its value as a continuing farm and not on any other basis.” Hovbilt, Inc. v. Township of Howell, 138 N.J. 598, 619, 651 A.2d 77 (1994); accord Van Wingerden v. Township of Lafayette, 303 N.J.Super. 614, 618, 697 A.2d 565 (App.Div.1997); Urban Farms, Inc. v. Township of Wayne, 159 N.J.Super. 61, 67, 386 A.2d 1357 (App.Div.), certif. denied, 78 N.J. 330, 395 A.2d 199 (1978). “Other benefits such as the maintenance of open spaces and the preservation of the beauty of the countryside, although incidental to the principal objective, were also significant factors in the passage of the amendment.” Hovbilt, supra, 138 N.J. at 619, 651 A.2d 77 (citing Township of Andover v. Kymer, 140 N.J.Super. 399, 404, 356 A.2d 418 (App.Div.1976) and Township of Galloway v. Petkevis, 2 N.J.Tax 85, 91 (Tax 1980)).
According to the Farmland Act,
the value of land, not less than 5 acres in area, which is actively devoted to agricultural or horticultural use and which has been so devoted for at least the 2 successive years immediately preceding the tax year in issue, shall, on application of the owner, and approval thereof as hereinafter provided, be that value which such land has for agricultural or horticultural use.
[N.J.S.A. 54:4-23.2.]
The Act defines agricultural use to include beekeeping for the purpose of selling products made by bees. The statute provides that land
shall be deemed to be in agricultural use when devoted to the production for sale of plants and animals useful to man, including but not limited to ... bees and apiary products____
[.N.J.S.A. 54:4-23.3.]
*159 The Act also contains a financial requirement for land to qualify for farmland assessment:
[L]and, five acres in area, shall be deemed to be actively devoted to agricultural or horticultural use when the amount of the gross sales of agricultural or horticultural products produced thereon ... have averaged at least $500.00 per year during the two-year period immediately preceding the tax year in issue____ In addition, where the land is more than five acres in area, it shall be deemed to be actively devoted to agricultural or horticultural use when the amount of the gross sales of agricultural or horticultural products produced on the area above five acres ... have averaged at least $5.00 per acre during the two-year period immediately preceding the tax year in issue....
ÍN.J.S.A. 54:4-23.5.]
Because farmland assessment represents a departure from the general principle that all property bear its fair share of the public burden of taxation, the Act, which accords treatment equivalent to a partial tax exemption, is construed against the party seeking preferential treatment. Van Wingerden v. Township of Lafayette, 18 N.J.Tax 81, 94 (Tax 1999), aff'd, 19 N.J.Tax 205 (App.Div.2000). In addition, the assessor’s determination denying a farmland application is presumed to be correct and the taxpayer bears the burden of proving entitlement to farmland assessment. Hovbilt, supra, 138 N.J. at 620, 651 A.2d 77; Brighton v. Borough of Rumson, 22 N.J.Tax 39, 52 (Tax 2005), aff'd, 23 N.J.Tax 60 (App.Div.2006); Miele v. Township of Jackson, 11 N.J.Tax 97, 99 (App.Div.1989). The county board judgment on a farmland assessment matter cannot be overturned until the taxpayer has produced sufficient competent evidence “ ‘definitive, positive, and certain in quality and quantity to overcome the presumption.’ ” Wyer v. Township of Middletown, 16 N.J.Tax 544, 546 (Tax 1997) (quoting Township of Byram v. Western World, Inc., 111 N.J. 222, 235, 544 A.2d 37 (1988)). It is against the backdrop of these precedents, and in light of the purpose of the Act, that the court must examine Atlantic Coast’s claims.
The municipality does not dispute that the subject property exceeds five acres. In addition, the parties are in agreement that apiary activity is expressly included within the statutory definition of agricultural or horticultural use within the meaning of the Act and that such activity took place on the property in the two-year period preceding the tax years at issue. See N.J.S.A. 54:4-23.3.
*160 Nor does the municipality contend that plaintiff has not met the income requirements of the statute. The Act sets a minimum gross income requirement for the subject property of an average of $535 for the two years preceding the tax years at issue ($500 for the first five acres and $5 per acre for the remaining seven acres). The record contains evidence that Wilson’s Honey paid the taxpayer at least $550 per year from 2004 to 2009 for the apiary products produced on the subject property. The fact that the beekeeping activity operated at a loss does not, in and of itself, disqualify the subject property for farmland assessment. N.J.S.A. 54:4-23.5 plainly defines the income requirement as “gross” income, not “net” income or “profits.”
Finally, the municipality does not dispute the taxpayer’s contention that the entire property is used for apiary activity. The beehives are located on the property and the record contains an unrefuted certification from Mr. Wilson that he has witnessed bees foraging throughout the property. There is nothing in the record to suggest that the bees forage on property other than the subject property, although there is legal precedent from this court suggesting that bees forage between one and four miles from the location of their hives. Brighton, supra, 22 N.J.Tax at 46-47; Wyer, supra, 16 N.J.Tax at 548 (Tax 1997) (holding lot seeded with clover not qualified for farmland assessment because taxpayer produced no evidence that the parcel was needed for production of honey in hives on neighboring lot and where it was probable that bees foraged on other parcels); Barrett v. Borough of Frenchtown, 6 N.J.Tax 558, 564 (Tax 1984) (holding that five-acre lot not qualified for farmland assessment where bees occasionally foraged for nectar on both the subject property and adjoining property). In light of the municipality’s concession and the Wilson certification, the credibility of which the court has no cause to doubt, the court concludes that the entire subject property is used for apiary activity.
Atlantic Coast’s beekeeping, standing alone, likely satisfies the statutory requirement for farmland assessment, as all of the statutory elements for farmland assessment are met. The complexity here, however, is that the subject property is also actively *161 devoted to another, non agricultural or horticultural use: the operation of a 290-foot tall cellular tower that generates rental income for the property owner, and licensing income for a related entity. Several precedents guide the court in its application of the Act in these circumstances.
“[W]here the entire parcel seeking farmland assessment qualification also was used for other purposes” the court must determine if the agricultural or horticultural use is the dominant use of the property. Township of Wantage v. Rivlin Corp., 23 N.J.Tax 441, 446 (Tax 2007). If the dominant use of the property is a use other than an agricultural or horticultural use, the property is not entitled to preferential farmland assessment.
The dominant use test was first applied by then-Judge Handler in City of East Orange v. Township of Livingston, 102 N.J.Super. 512, 246 A.2d 178 (Law Div.1968), aff'd, 54 N.J. 96, 253 A.2d 546 (1969). In that case, East Orange sought farmland assessment for approximately 2,500 acres it owned in three municipalities. Id. at 518, 246 A.2d 178. The land had been acquired by deed and condemnation for the purpose of collecting and protecting a supply of potable water for the inhabitants of East Orange. The land was mostly vacant, partially heavily wooded, and had numerous low meadows traversed by brooks and streams. Id. at 524, 246 A.2d 178. The city collected potable water through a series of wells located over natural underground storage areas for rain water that percolated and infiltrated through the soil across the thousands of acres that constitutes the city’s water reserve. Id. at 523, 246 A.2d 178. There was no reservoir or man-made water storage facility on the property. Water was pumped from the property to reservoirs located on other parcels. Id. at 524, 246 A.2d 178.
The city used the land for water collection and storage purposes for more than sixty years before it applied for farmland assessment of the land. Id. at 522, 246 A.2d 178. The city’s farmland assessment application was based on its contention that a large portion of the property was woodlands, “permanent pasture,” and “farm acreage” associated with several former farmhouses on the property which were occupied by city employees. Id. at 524, 246 *162 A.2d 178. The city derived annual income in excess of the statutory minimum from the sale of hay, timber and cordwood grown on the property. Id. at 526, 246 A.2d 178. In 1965, income to the city from the sale of timber from the property exceeded $24,000. Id. at 528-529, 246 A.2d 178.
The question before the court was whether the city’s property should be taxed pursuant to N.J.S.A. 54:4-3.3, which applies to municipal-owned land “used for the purpose and for the protection of a public water supply,” and which allows the lands to be taxed “in the same manner and to the same extent as the lands of private persons,” or the farmland assessment statutes. Judge Handler concluded that the dominate use of the city’s land controlled its status under the local property tax laws. He concluded that the protection of a public water supply dominated over the “merely incidental” agricultural and horticultural uses to which the city put the property. Id. at 529, 246 A.2d 178. As the court explained,
[e]ven though the agricultural use is “active” in the literal sense that East Orange has realized income in excess of $500 per annum for the past two years from the sale of timber, cordwood and hay, compliance with this single criterion does not per se render the Water reserve as land “devoted” to agricultural use.
[Id. at 536,246 A.2d 178 (citation omitted).]
Noting that there can be multiple, simultaneous uses of property, the court held that “[depending upon the particular lands involved, one use tends to become dominant.” Id. at 537, 246 A.2d 178. The court held that because harvesting crops and managing forests on the property supported the recharge and replenishment of the wells, “the agricultural uses of the Water Reserve must be regarded as subservient to its dominant use as a public water supply.” Ibid. “In no sense, therefore, can it be said that the East Orange Water Reserve is devoted, that is, committed, or dedicated, or set apart or appropriated, or given up wholly or chiefly to the production for sale of agricultural products of any kind within the meaning” of the Act. Ibid. Instead, the land “is devoted to the purpose for which it was originally acquired,” the protection of a public water supply. Ibid.[3]
*163 This court applied the dominate use test in Green Pond Corp. v. Township of Rockaway, 2 N.J.Tax 273 (Tax 1981), aff'd, 4 N.J.Tax 534 (App.Div.1982). There, the property owners purchased undeveloped woodland adjacent to a private residential lake community which they owned and managed. The land was used both for hiking, picnicking and other recreational pursuits by the residents of the community and for the production of woodland products. Id. at 288-291. The court held that the dominate use of the property was as a component of the residential community and not an agricultural or horticultural use. The court held that the recreational use of the property “is consistent with the nature of the entire ... tract as a residential community and the existence of the plaintiff corporations to manage that community for the benefit of its residents.” Id. at 291.
Importantly, the court considered the fact that the agricultural activity was chiefly designed to satisfy the farmland assessment statutes. As Judge Andrew explained:
The two corporations were formed in 1921 to manage a private residential lake community. Some 50 years later 555 acres of undeveloped woodland wore acquired. In the years since then activities were undertaken aimed at producing sufficient agricultural income to satisfy the Farmland Assessment Act. This is particularly evident in the agreement with Donatoni Brothers, Inc., in which that corporation was committed to purchase a certain dollar value of timber just over the statutory minimum for property of this size. Although that fact of itself does not deny a bona fide agricultural use, taken together with the other use of the property it lends credence to the conclusion that the agricultural activities were planned primarily to satisfy the statute.
[Id. at 290.]
The significance of this finding was illustrated by the court:
Plaintiffs assert that the subjective intent of the owners of property regarding its use is irrelevant as long as the acreage and income requirements of the statute are satisfied. That contention must give way to the extent it conflicts with the requirement of dominant agricultural use set forth in East Orange v. Township of Livingston].
[Id. at 290-291.]
When viewed through the prism of these precedents, the undisputed facts of this ease lead to the conclusion that the dominate *164 use of the subject property is not agricultural or horticultural. Atlantic Coast’s history with the property reveals an intention to construct a cellular telephone tower for commercial exploitation. As a contract lessee, AC Communications, an entity related to Atlantic Coast through Mr. Schmidt, sought and secured multiple variances to permit the construction of an approximately 25-story high structure in the center of remote, vacant land. The 12.24-aere size of the property was considered by the Zoning Board of Adjustment when it decided whether to allow the non-conforming, 290-story tower to be constructed at over twice the height otherwise permitted, and closer to the property boundaries and neighboring residence than allowed by the zoning ordinance.
Once the variances were secured, Mr. Schmidt purchased the property for nearly a quarter of a million dollars. He subsequently transferred ownership to Atlantic Coast for $100. Shortly thereafter Atlantic Coast contracted with AC Communications to construct the tower. Although the record is silent with respect to the costs incurred in erecting the structure, it would be reasonable to conclude that the construction and installation of a 290-foot tower equipped to transmit cellular telephone communications for multiple carriers represents a significant capital expenditure. AC Communications thereafter was granted a ground lease for the tower and associated structures and now enjoys a revenue stream from licensing the use of the tower and pays a significant annual rent to Atlantic Coast. It was only after approval of the cellular tower enterprise that Atlantic Coast contacted Wilson’s Honey to initiate apiary activities on the property.
In addition, operation of the cellular tower dominates over the beekeeping activity on the property. From a physical perspective, the cellular tower and associated buildings occupy a small portion of the parcel. While plaintiff argues that the height of the tower is irrelevant to the court’s consideration, the existence of a 290-foot high structure on the property solely for cellular communications purposes cannot be overlooked. By its sheer size the tower dominates the physical aspects of the property. The entire 12.24, otherwise vacant, acres were certainly a primary consideration of zoning officials when deciding whether to issue the variances *165 necessary to install the structure. The beekeeping activities, on the other hand, are carried out in eight beehives. Although the record is silent with respect to the size of the beehives, the parties agree that all of the hives are contained within the chain-linked fence encompassing the cellular tower. It is reasonable to drawn an inference from the record that the tower dwarfs the beehives.
From an operational perspective, the cellular communications enterprise requires no human presence at the property, apart from occasional maintenance. Atlantic Coast argues that operation of the tower is a passive endeavor carried out through the transmission of electronic communications. Operation of the cellular tower, however, is no more passive an activity than is beekeeping. The apiary activity requires little human presence at the property, apart from the occasional maintenance of the hives and collection of honey and wax. It is the bees who do the work of flying around the property, foraging among the plants and producing products. The two uses of the property are similarly passive in nature.
The facts militate toward a finding that the non-agricultural use of the property dominates over the apiary activity. The subject property is not “devoted, that is, committed, or dedicated, or set apart or appropriated, or given up wholly or chiefly to the production for sale of’ apiary products. See East Orange, supra,, 102 N.J.Super. at 537, 246 A.2d 178. Atlantic Coast first installed a profit-making, non-agricultural use of the property, which required a significant capital investment. It thereafter undertook a deliberate course of action to barely satisfy the Act, even incurring an annual loss, in an attempt to secure a tax benefit for it cellular tower operations and its ground lessee, AC Communications, which is responsible for the payment of taxes on the property. It is true that as a result of Atlantic Coast’s acts an out-of-State farmer is keeping bees at the property, something that likely would not be taking place absent the incentive of farmland assessment. That fact alone, however, does not mandate a tax benefit. The entire property is being used predominately for the purpose for which it was acquired: the generation of income from the *166 operation of a cellular tower and not for agricultural activity. The Act does not accord preferential treatment in these circumstances.
Plaintiff has not requested relief pursuant to N.J.S.A. 54:4-23.16, which provides that
[separation or split off of a part of the land which is being valued, assessed and taxed under [the Act], either by conveyance or other action of the owner of such land, for a use other than agricultural or horticultural, shall subject the land so separated to liability for the roll-back taxes applicable thereto, but shall not impair the right of the remaining land to continuance of valuation, assessment and taxation [under the Act], provided it meets the 5-acre minimum requirement and such other conditions of this act as may be applicable.
Atlantic Coast does not contend that the portion of the property enclosed by the chain-link fence on which the cellular tower and associated buildings stand has been separated from the remainder of the property and devoted to a use other than agricultural or horticultural use. To the contrary, the taxpayer placed the beehives within the chain-link fence and argues that the entire lot, including the 14,962 square feet on which the cellular tower stands, is actively devoted to beekeeping. Nor is it clear that N.J.S.A. 54:4-23.16 applies in this instance, given that the statute refers to the application of roll-back taxes on land previously qualified for farmland assessment and the continued treatment as farmland of land already granted farmland assessment under the Act. Those circumstances are not present here.
The township’s motion for summary judgment is granted. The taxpayer’s motion for summary judgment is denied. The court will issue Judgments affirming the decisions of the county board of taxation for the tax years at issue.

 Plaintiff produced no evidence regarding the amount of rental income realized by Atlantic Coast with respect to the cellular tower during 2006.

 Plaintiff produced no evidence regarding the apiary-related expenses incurred by Atlantic Coast during 2006.

 Because the holding in East Orange was affirmed by the Supreme Court, the suggestion in Urban Farms, supra, that the agricultural or horticultural use must *163 be exclusive to quality for farmland assessment is not controlling. See Mt. Hope Mining Co. v. Township of Rockaway, 8 N.J.Tax 570, 579 (Tax 1986).